# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# COLUMBIA DIVISION

| | |
|---|---|
| JOHNATHAN DUNN, | ) |
| Plaintiff, | ) |
| v. | ) No. 1:13-0114 |
| BEN KILLINGSWORTH, in his individual and official capacities, | ) Judge Haynes |
| ARVIL CHAPMAN, in his individual and official capacities, | ) Jury demand |
| CAROLYN JORDAN, in her individual and official capacities, | ) |
| BYRON PONDS, in his individual and official capacities, | ) |
| RONDA HOLLY, in her individual and official capacities, | ) |
| HANK INMEN, in his individual and official capacities, | ) |
| MARTHA HAMMOCK, in her individual and official capacities, | ) |
| BRANDI FENDER, in her individual and official capacities, | ) |
| JOHN KITTY, in his individual and official capacities, | ) |
| JASON WOODALL, in his individual and official capacities, | ) |
| and CORRECTIONS CORPORATION OF AMERICA, in its individual and official capacities, | ) |
| Defendants. | |

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

Plaintiff, Johnathan Brandon Dunn, through his undersigned attorneys, states as follows:

## INTRODUCTION

1. This civil action seeks monetary damages and injunctive relief for the extraordinary injuries and losses suffered by Plaintiff Johnathan Dunn, who was wrongfully deprived of basic protections by those responsible for assessing the need for Protective Custody while he was incarcerated, in violation of Mr. Dunn's rights under the U.S. Constitution and the laws of the State of Tennessee. Upon Mr. Dunn's attempts to redress these harms through the First Amendment-protected conduct of filing a lawsuit against those responsible, Mr. Dunn was retaliated against when Defendants assigned him to share a cell with a known associate of those from whom he had originally sought protection, resulting in physical and sexual abuse, and culminating in Mr. Dunn inflicting harm upon himself in order to escape his attacker's clutches.

## PARTIES

2. Plaintiff Johnathan Brandon Dunn ("Dunn") is currently incarcerated in Lois M. DeBerry Correctional Facility, within the Middle District of Tennessee. At all times pertinent to the Defendants' wrongful conduct, Dunn was incarcerated in the South Central Correctional Facility ("SCCF") or the Charles Bass Correctional Facility, both within the Middle District of Tennessee.

3. Defendant Benjamin Killingsworth is and was at all times pertinent to this Complaint a Unit Manager and the Chairperson for the Protective Custody panel of SCCF, which is located in Clifton, Tennessee, Wayne County, within the Middle District of Tennessee. Defendant Killingsworth is being sued in his individual capacity for his role in causing Plaintiff's harms and in his official capacity because at times relevant to this Complaint, he was a final policymaker responsible for his own actions as Chairperson for the Protective Custody panel, and was acting in an administrative capacity with respect to certain matters alleged in this

Complaint. At times relevant to this Complaint, Defendant Killingsworth acted under color of state law.

4. Defendant Arvil Chapman was, at all times pertinent to this Complaint, the warden of South Central Correctional Facility. Defendant Chapman is being sued in his individual capacity for his role in causing Plaintiff's harms and in his official capacity because at times relevant to this Complaint, he was a final policymaker responsible for his own actions in reviewing the outcomes of all protective custody hearings and prison cell assignment, and was acting in an administrative capacity with respect to certain matters alleged in this Complaint. At times relevant to this Complaint, Defendant Chapman acted under color of state law.

5. Defendant Carolyn Jordan was, at all times pertinent to this Complaint, the Tennessee Department of Corrections liaison to South Central Correctional Facility. Defendant Jordan is being sued in her in her individual capacity for her role in causing Plaintiff's harms and in her official capacity because at times relevant to this Complaint, she was responsible for ensuring Tennessee Department of Corrections policies were being upheld at South Central Correctional Facility, and was acting in an administrative capacity with respect to certain matters alleged in this Complaint. At times relevant to this Complaint, Defendant Jordan acted under color of state law.

6. Defendant Byron Ponds was, at all times pertinent to this Complaint, the Facilities Investigation Manager at South Central Correctional Facility. Defendant Ponds is being sued in his individual capacity for his role in causing Plaintiff's harms and in his official capacity because at times relevant to this Complaint, he was responsible for ensuring Mr. Dunn's allegations were investigated in order to ensure his safety, and was acting in an administrative

capacity with respect to matters alleged in this Complaint. At times relevant to this Complaint, Defendant Ponds acted under color of state law.

7. Defendant Ronda Holly is and was at all times pertinent to this Complaint a guard at SCCF, which is located in Clifton, Tennessee, Wayne County, within the Middle District of Tennessee. Defendant Holly is being sued in her individual capacity for her role in causing Plaintiff's harms and in her official capacity because at times relevant to this Complaint, she had the ability to intervene and prevent Mr. Dunn from suffering from further abuse. At times relevant to this Complaint, Defendant Holly acted under color of state law.

8. Defendant Hank Inmen is and was at all times pertinent to this Complaint a guard at SCCF and a Senior Security Threat Group ("STG") Official. Defendant Inmen is being sued in his individual capacity for his role in causing Plaintiff's harms and in his official capacity because at times relevant to this Complaint, he knew or should have known of the threat posed to Mr. Dunn by members of STGs and was responsible for taking action to prevent harm. At times relevant to this Complaint, Defendant Inmen acted under color of state law.

9. Defendant Martha Hammock is and was at all times pertinent to this Complaint a guard at SCCF. Defendant Hammock is being sued in her individual capacity for her role in causing Plaintiff's harms and in her official capacity because at times relevant to this Complaint, she had the ability to intervene and prevent Mr. Dunn from suffering from further abuse. At times relevant to this Complaint, Defendant Hammock acted under color of state law.

10. Defendant Brandi Fender is and was at all times pertinent to this Complaint a guard at SCCF, which is located in Clifton, Tennessee, Wayne County, within the Middle District of Tennessee. Defendant Fender is being sued in her individual capacity for her role in causing Plaintiff's harms and in her official capacity because at times relevant to this Complaint,

she had the ability to intervene and prevent Mr. Dunn from suffering from further abuse. At times relevant to this Complaint, Defendant Fender acted under color of state law.

11. Defendant John Kitty is and was at all times pertinent to this Complaint a guard at SCCF, which is located in Clifton, Tennessee, Wayne County, within the Middle District of Tennessee. Defendant Kitty is being sued in his individual capacity for his role in causing Plaintiff's harms and in his official capacity because at times relevant to this Complaint, she had the ability to intervene and prevent Mr. Dunn from suffering from further abuse. At times relevant to this Complaint, Defendant Kitty acted under color of state law.

12. Defendant Jason Woodall was, at all times pertinent to this Complaint, the Tennessee Department of Corrections Deputy Commissioner of Operations. Defendant Woodall is being sued in his individual capacity for his role in causing Plaintiff's harms and in his official capacity because at times relevant to this Complaint, he was responsible for ensuring Tennessee Department of Corrections policies were being upheld at South Central Correctional Facility, and was acting in an administrative capacity with respect to certain matters alleged in this Complaint. At times relevant to this Complaint, Defendant Woodall acted under color of state law.

13. Defendant Corrections Corporation of America ("CCA") is a corporation that manages private prisons and detention centers through contracts with United States governments, including the South Central Correctional Facility in Clifton, Tennessee. CCA's corporate headquarters is in Nashville, Tennessee, within the Middle District of Tennessee. CCA is being sued in its individual capacity for his role in causing Plaintiff's harms and in its official capacity because at times relevant to this Complaint, CCA was a final policymaker in determining rules and policies of SCCF responsible for its own actions, and was acting in an administrative

capacity with respect to certain matters alleged in this Complaint. At times relevant to this Complaint, Defendant CCA acted under color of state law.

## JURISDICTION AND VENUE

14. This action arises under the laws of the United States, and jurisdiction is conferred on this Court under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights). Supplemental jurisdiction of the Court over the claims arising under state law is invoked under 28 U.S.C. § 1367 (supplemental jurisdiction).

15. Venue in the Middle District of Tennessee is proper under 28 U.S.C. § 1391(b), because it is the district in which many if not all of the defendants reside, and because a substantial portion of the events or omissions giving rise to the claims occurred within the Middle District of Tennessee.

## JURY DEMNAD

16. Mr. Dunn requests a jury trial on the issues and claims set forth in this Complaint.

## FACTS

17. The actions giving rise to Mr. Dunn's Complaint stem from a prison sentence he served in the South Central Correctional Facility ("SCCF") between February 8, 2013 and March 31, 2014. However, previous events dating back to Mr. Dunn's incarceration in juvenile detention centers are relevant to his Complaint.

18. As a minor, Mr. Dunn was convicted of attempted rape and served time in Woodland Hills juvenile detention center and Mountain View youth detention center. He remained incarcerated until he was released on his eighteenth birthday.

19. During his incarceration at these juvenile detention centers, other inmates were aware of the fact that Mr. Dunn's conviction was for attempted rape, making him a target for

physical and sexual abuse. One of his fellow juvenile inmates was an individual that Mr. Dunn knew only as "Jay Duce."

20. "Jay Duce" is the known alias of Jason Biles, a known member of the notorious Crips gang.

21. On information and belief, all Defendants knew or should have known at times relevant to this Complaint that Jason Biles is a known member of the Crips gang and "Jay Duce" is his known gang alias.

22. After being released from juvenile detention due to reaching the age of majority, Mr. Dunn engaged in criminal conduct that led to his incarceration.

23. Mr. Dunn had problems with members of the Aryan Brotherhood gang, a prison Security Threat Group ("STG"), and at times was forced to request Protective Custody due to the gang members' retaliation. At other times, Mr. Dunn sought protective custody because fellow inmates were aware of his juvenile sex offense, making Mr. Dunn a target for sexual and physical abuse.

24. While Mr. Dunn was incarcerated at facilities operated by TDOC, his requests for Protective Custody were always treated seriously. He would be assigned to Protective Custody, a status in which he would be removed from the general population with no cellmate or a cellmate known not to be a safety risk, or reassigned to a unit where there were no known safety risks to Mr. Dunn. Unlike the traditional solitary confinement that accompanies Administrative Segregation, these resolutions to Mr. Dunn's concerns for his own well-being had minimal repercussions for his ability to experience normal prison life and privileges such as attending rehabilitative classes or engaging in recreation, or any impact on Mr. Dunn's disciplinary record, security clearance level, good time credits, or ability to be paroled.

25. In December 2012, Mr. Dunn pled guilty to an offense and received a sentence for six years and one month. At the time of his arrest he was incarcerated in the Morgan County Correctional Complex, operated by TDOC. Mr. Dunn was granted Protective Custody at the Morgan County Correctional Complex upon informing prison staff of the fact that some of his fellow inmates were aware of his juvenile attempted rape sentence.

26. On February 8, 2013, Mr. Dunn was transferred to SCCF. Jason Biles had a court appearance on the same day, and during the transfer process threatened Mr. Dunn with grave bodily harm at SCCF if Mr. Dunn did not comply with his forthcoming demands.

27. On arrival, Mr. Dunn explained his interaction with Biles to guard John Kitty, further explained that his prior conviction for attempted rape made him a likely target of violence, and requested Protective Custody. Kitty responded that Mr. Dunn should "man up" and "stop being a bitch."

28. Because Mr. Dunn's request for Protective Custody was denied, Mr. Dunn was forced to refuse his cell assignment in order to maintain his own safety.

29. Mr. Dunn was sent to Administrative Segregation. Administrative Segregation, known in common parlance as "solitary confinement," is a disciplinary consequence for disobeying prison rules, in Mr. Dunn's case refusing to return to his cell assignment where he feared violence. The Administrative Segregation unit at SCCF where Mr. Dunn was assigned was named "Sky Lab" by CCA staff.

30. Jason Biles, known only as "Jay Duce" to Mr. Dunn at that time, was also assigned to Skylab and worked in the kitchen at the same time as Mr. Dunn. Upon seeing Mr. Dunn, Biles notified Dunn that he was going to inform his fellow Crips gang members of Dunn's

previous sexual crime, making Dunn a target for abuse. Biles informed Mr. Dunn that he would have to pay the Crips to live on the SCCF compound, or suffer beatings or stabbings.

31. Based on Biles' threats, Mr. Dunn filed an official request for Protective Custody on March 5, 2013, in which he specifically noted that "Jay Duce" knew of his previous sexual offenses and had told his fellow gang members.

32. Defendant Killingsworth denied Mr. Dunn's request. He may have convened a Protective Custody panel to do so, but on information and belief, Killingsworth and/or the panels that he organized would routinely deny such requests without following TDOC protocol.

33. Because Mr. Dunn's request for Protective Custody was denied and Biles had threatened his well-being, Dunn continued to refuse his cell assignment and faced disciplinary repercussions.

34. Defendant Killingsworth's decision to deny Mr. Dunn's Protective Custody request was approved by Defendant Chapman.

35. On information and belief, Defendants Killingsworth and Chapman used the Protective Custody program as a means of obtaining information, rather than for the protection of vulnerable inmates. Inmates like Mr. Dunn, whose personal safety depended upon protection from particular members of the inmate population, were routinely sent to Administrative Segregation at "Sky Lab" rather than a Protective Custody program unless they agreed to provide Defendants with information they deemed valuable.

36. Mr. Dunn unsuccessfully filed a grievance and exhausted his appeals in order to have his Protective Custody request reconsidered.

37. Defendant Woodall reviewed Mr. Dunn's grievance and summarily dismissed it without following through on whether SCCF was actually employing TDOC protective custody policies.

38. During his time spent in Administrative Segregation, Mr. Dunn was assigned to share a cell with another inmate known only to Mr. Dunn as "World," who is a member of the Crips with Biles. Biles and World discussed Dunn's identity. World informed Mr. Dunn that he could perform services for the Crips, such as maintaining possession of contraband like weapons or drugs, or pay members of the Crips in order to avoid physical harm.

39. During Mr. Dunn's time in Administrative Segregation, he was penalized with administrative points that raised his security level, he was unable to attend rehabilitative programs that would assist him in securing parole and prevent recidivism upon parole, and the date on which he would be eligible for parole was pushed back.

40. Between April 21, 2013 and July 31, 2013, Mr. Dunn's family members, including his cousin Boyd Denton and the mother of his child, April Creasy, deposited sums between $45 to $50 every two weeks into the accounts of Crips members Billy Benton and Garland Powell using the "JPay" system. These payments were made in order to secure Mr. Dunn's safety.

41. On information and belief, prison officials routinely monitor "JPay" and other commissary payments for common depositors to monitor potential illegal conduct among inmates.

42. During the time period that Mr. Dunn's family was paying off Crips members Billy Benton and Garland Powell, gang violence at SCCF was escalating.

43. On information and belief, at any given time, there were at least twenty-five inmates assigned to Administrative Segregation in Sky Lab because Defendants would not grant them Protective Custody.

44. On July 29, 2013, while Mr. Dunn was assigned to SCCF's "Apollo A" pod, Crips members demanded that Mr. Dunn take possession of a shank for their use in the ongoing gang violence.

45. Rather than comply with the Crips members request, Mr. Dunn again requested Protective Custody, explaining to Defendant Inmen that he was being extorted in order to protect himself from Crips gang members that knew of his juvenile sexual crime charge. His request was denied.

46. Mr. Dunn filed another grievance, and a round of appeals was exhausted, but Mr. Dunn continued to suffer administrative penalties for refusing his cell assignment.

47. Defendant Woodall again reviewed Mr. Dunn's grievance and summarily dismissed it without following through on whether SCCF was actually employing TDOC protective custody policies.

48. In August and September of 2013, at least five gang related stabbings took place in SCCF, resulting in two deaths, including the death of a prisoner who had requested Protective Custody. An inmate named Parker who had been granted four months in Protective Custody for giving SCCF officials information about the Aryan Nation STG was found dead in the "Enterprise" unit with his throat sliced, shortly after being re-released into the general population. On information and belief, Parker's death was classified as a suicide. "Big O," a ranking member of the Crips gang with three months left on his sentence, was stabbed to death

by Blood gang members in the "Gemini" unit, and the Crips gang retaliated by stabbing a Blood member in the "Apollo" unit showers.

49. At this time the prison went into lockdown, and Plaintiff and the other inmates in Sky Lab who had been refused Protective Custody were no longer allowed to exercise, and rarely received their meals at a safe food temperature. Mr. Dunn filed grievances and exhausted appeals regarding these conditions to no avail.

50. Mr. Dunn made requests to Defendants Hammock, Holly, and Fender at various times to be placed in Protective Custody for his own safety, describing the reasons for his request, to no avail.

51. On September 24, 2013, Mr. Dunn filed a complaint in the Middle District of Tennessee, alleging that Defendants Killingsworth and Chapman had violated the Eighth Amendment by refusing to place Mr. Dunn into Protective Custody.

52. SCCF guards and employees under the instruction of Defendants Killingsworth and Chapman then began subjecting Mr. Dunn to a pattern of retaliatory conduct in response to the filing of his lawsuit.

53. After filing the lawsuit, Mr. Dunn was only granted limited access to the prison's law library.

54. After filing the lawsuit, SCCF officials refused to allow Mr. Dunn to make phone calls and he had trouble receiving his legal mail.

55. In February 2014, Mr. Dunn was assisting his fellow inmates as a "jail house lawyer," and he began accumulating statements from inmates who had similarly been unable to enter Protective Custody.

56. On February 21, 2014, a postmarked Motion of Petition was dispatched by SCCF officials, including a Motion drafted by Mr. Dunn requesting to include the testimony of two fellow inmates who had suffered as a result of not being granted Protective Custody. In these inmates' written statements, former Blood member Antonio Miller named the Crips directly as the gang extorting prisoners. Mr. Dunn's annual review was also included indicating harms to his security classification and his inability to rehabilitate due to his time in Administrative Segregation.

57. On February 22, 2014, the day after dispatching these petitions, SCCF officials moved Mr. Dunn's current cellmate two cells away, claiming they needed the bed space. Inmate Quintin Scharkley, a known Crips member, was assigned to Mr. Dunn's cell.

58. Inmate Scharkley informed Mr. Dunn that he knew Dunn had reported a fellow Crips member for threats and extortion, and that Mr. Dunn therefore owed the Crips. He informed Mr. Dunn that if he did not behave as Scharkley demanded, Dunn would be killed.

59. Over the next several days, Scharkley would repeatedly pull Mr. Dunn off of his bunk by his hair and smack and hit Mr. Dunn in the face and torso.

60. Sometime after 6 pm on February 23, 2014, Scharkley grabbed Mr. Dunn by the hair, pulling him off his bunk and dragging him across the cell. He forced Mr. Dunn to kneel between the toilet and the wall with his pants pulled down and "put on a show" by repeatedly inserting and removing his fingers from his exposed anus while Scharkley masturbated.

61. Mr. Dunn was forced to perform the same degrading sexual acts on February 24, 2014.

62. Scharkley forced Mr. Dunn to scrub the cell floor with his toothbrush on February 24, 2014.

63. At 1:30 am on February 25, 2014, Scharkley forced Mr. Dunn to perform the degrading sexual acts yet again.

64. During the day on February 25, 2014, Mr. Dunn slipped a note into some legal paperwork that he handed off to an inmate library clerk. This note explained Scharkley's behavior so that prison officials could discretely remove Mr. Dunn to a place where he would no longer be physically, sexually, and emotionally abused without revealing to Scharkley that Dunn had circumvented his orders to cooperate or face death.

65. SCCF Case Manager Ronda Staggs ultimately received Mr. Dunn's note. She visited Mr. Dunn's cell and asked if everything was okay, but Dunn had written the note for the purposes of not defying Scharkley to his face, and did not say anything about the abuse aloud.

66. After 24 hours had passed since Mr. Dunn had passed off the note and he had received no relief, Mr. Dunn sliced his own arm with a razor while in the showers in order to be removed from Scharkley's control.

67. Mr. Dunn's superficial arm wound was treated, but no other physical examination was performed.

68. Mr. Dunn was placed in the Medical Mental Health wing on mandatory suicide watch, where he was given only a smock to wear and slept on a bare concrete bed in a frigid room with 24 hour lighting, without toiletries or a towel to dry off with after showering. Mr. Dunn remained in these conditions until March 5, 2014.

69. On February 27, 2014, mental health employee Mark Collins approached Mr. Dunn and asked him about the note that guards had received. Mark Collins took a statement from Mr. Dunn describing what he had been subjected to in the cell with Scharkley and reported it to Facility Investigations Manager Byron Ponds.

70. Defendant Ponds concluded that Plaintiff should not be granted Protective Custody. He concluded that no sexual assault had occurred because Scharkley had not made physical contact with Dunn during the sexual acts. Defendant Ponds concluded that Mr. Dunn should return to the cell with Scharkley.

71. Mr. Dunn refused to return to the cell with Scharkley, and filed for a temporary restraining order ("TRO") with the District Court for the Middle District of Tennessee in order to escape the retaliatory conduct he had faced at SCCF that had placed him under Scharkley's control.

72. Mr. Dunn was transferred to the Charles Bass Correctional Facility ("Charles Bass") in Nashville for a hearing related to his TRO request.

73. Upon arriving at Charles Bass, a TDOC facility, Mr. Dunn was informed that he was being investigated for Administrative Segregation on the advice of SCCF personnel.

74. Charles Bass officials performed an investigation to determine whether Mr. Dunn should be placed in Administrative Segregation as suggested by SCCF officials and concluded that Mr. Dunn should instead be placed in Protective Custody.

75. The District Court ordered a TRO granting Mr. Dunn a transfer from SCCF during the pendency of this action. Mr. Dunn's sole request was that he not be assigned to a CCA-managed facility.

76. Although Mr. Dunn had packed up his belongings at SCCF before his transfer to Charles Bass for the hearing, most of his personal belongings never arrived. These included legal form and documents related to his case against SCCF personnel, three books of stamps, letters with the addresses of his family members and friends, pictures of his children, clothing, and twenty-seven magazines.

77. Because Mr. Dunn's security and mental health levels were quite high after receiving so many disciplinary charges at SCCF for refusing cell assignment and committing self-harm in order to escape Scharkley, Mr. Dunn was transferred to Lois M. DeBerry Correctional Facility, a facility better equipped to handle inmates with Mr. Dunn's security and mental health levels.

78. In March of 2014, the inmates who Plaintiff had assisted as a jailhouse attorney were all transferred to the CCA-managed Whiteville Correctional Facility in Whiteville, Tennessee.

79. On information and belief, Defendant CCA promotes conduct such as denying Protective Custody in order to reduce operating costs, placing corporate profits through lean operations at a higher priority than basic inmate safety in violation of Plaintiff and his fellow inmates' civil and human rights and clear TDOC policies protocol.

80. On information and belief, Defendant CCA encourages policies that prevent early release or parole and embrace recidivism in order to maintain larger and more profitable prison populations in violation of Plaintiff and his fellow inmates' civil and human rights and clear TDOC policies and protocol.

## CLAIMS FOR RELIEF

### First Cause of Action
### (42 U.S.C. § 1983; Eighth Amendment violations by All Defendants)

81. By their policies and practices described herein, all Defendants subjected Plaintiff and all similarly situated inmates to a substantial risk of serious harm and injury by refusing to grant Protective Custody unless inmates were willing to provide information in a quid pro quo transaction. These policies and practices have been and continue to be implemented by Defendants and their agents, officials, employees, and all persons acting in concert with them

under color of state law, in their official capacities, and are the proximate cause of the Plaintiff's deprivation of rights secured by the United States Constitution under the Eighth Amendment.

82. Plaintiff was extorted by inmates due to Defendants' deliberate indifference to his safety.

83. Plaintiff was physically, sexually, and mentally abused by Quintin Scharckley due to Defendants' deliberate indifference to Plaintiff's safety.

84. Defendants have been and are aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

## Second Cause of Action
### (42 U.S.C. § 1983; First Amendment Retaliation by Defendants Killingsworth and Chapman)

85. By their policies and practices described herein, Defendants Killingsworth and Chapman subjected Plaintiff to serious physical and mental harm and injury by assigning or having assigned a known Crips gang member to share a cell with Plaintiff in retaliation for his First Amendment-protected conduct of filing a lawsuit against prison officials. Such policies and practices have been and continue to be implemented by Defendants and their agents, officials, employees, and all persons acting in concert with them under color of state law, in their official capacities, and are the proximate cause of the Plaintiff's injuries. Such conduct would chill a person from implementing his or her rights secured by the United States Constitution under the First Amendment.

86. Defendants knowingly assigned a Crips gang member to Plaintiff's cell in order to harm Plaintiff and chill his First Amendment-protected conduct.

87. Plaintiff was physically, sexually, and emotionally assaulted by the gang member that Defendants assigned to his cell as a result of Defendants' efforts to harm Plaintiff and chill his First Amendment-protected conduct.

88. Defendants knowingly prevented Plaintiff from accessing the legal library, receiving his mail, and conducting phone calls in order to interfere with and chill his First Amendment-protected conduct.

89. Defendants knowingly withheld Plaintiff's personal property including legal forms and documents in order to interfere with and chill Plaintiff's First Amendment-protected conduct.

90. Defendants knowingly withheld Plaintiff's personal property including irreplaceable pictures of his children and personal letters from family members, as well as items of value, in order to chill Plaintiff's First Amendment-protected conduct.

## RELIEF REQUESTED

WHEREFORE, JOHNATHAN DUNN prays that this Court grant the following relief:

A. Declare that the acts and omissions of the Defendants violate Plaintiff's constitutional rights and federal law;

B. Enter a preliminary and permanent injunction requiring Defendants, their agents, subordinates, employees, and all others acting in concert with them to cease their unconstitutional and unlawful practices and to remedy their violations of the Constitution and the laws;

C. Award compensatory damages to Mr. Dunn for any and all economic losses he has suffered as a result of Defendants' actions, including court costs and attorneys fees, lost wages, the value of lost and withheld personal property, money extorted from Mr. Dunn's family

members, compensation for Mr. Dunn's physical injuries, and other applicable restitution, as well as for pain and suffering, embarrassment, and humiliation to Mr. Dunn caused by the Defendants' conduct;

D. Award nominal damages for Plaintiffs' pain, suffering, and mental anguish;

E. Award punitive damages to Mr. Dunn as a deterrent to Defendants' repetition of similar malicious, and willful acts;

F. Award all injunctive or equitable relief to which Mr. Dunn may be entitled, including an order that he not be returned to any prison operated by Corrections Corporation of America until Defendants provide a documented plan to enforce TDOC policies and procedures for protective custody that will protect Mr. Dunn from such conduct as he suffered from in the South Central Correctional Facility;

G. Award to Mr. Dunn the costs and disbursements of this action, including attorney's fees, costs and expenses; and

H. Grant such other and further relief as the Court deems just and proper.

DATED: October 30, 2014

Respectfully submitted,

/s/ Seamus T. Kelly
J. Gerard Stranch, IV, BPR #23045
Seamus T. Kelly, BPR #32202
Branstetter, Stranch & Jennings, PLLC
227 Second Avenue North, 4th Floor
Nashville, Tennessee 37201
Tel: 615-254-8801
Fax: 615-255-5419

*Attorneys for Johnathan Dunn*

# **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing has been electronically transmitted, to counsel for Defendants via U.S. Mail and electronic mail:

James I. Pentecost
Jonathan David Buckner
Pentecost & Glenn, PLLC
106 Stonebridge Boulevard
Jackson, TN 38305
(731) 668-5995
Fax: (731) 668-7163
Email: jpentecost@pgandr.com
Email: jbuckner@pgandr.com.
*Attorneys for Defendants Ben Killingsworth*
*and Arvil Chapman*

This 30th day of October, 2014.

/s/ Seamus T. Kelly